IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| BELVERLY OLLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:06-CV-171 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying *pro se* plaintiff's claim for disability insurance and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 18] will be granted, and plaintiff's motion for summary judgment [doc. 16] will be denied.

I.

*Procedural History*

Plaintiff was born in 1968. She applied for benefits in early 2003, claiming to be disabled by "lumbar disc injury to neck and back causing severe pain." [Tr. 68, 72, 114]. Plaintiff alleged a disability onset date of December 18, 2002. [Tr. 68, 114]. Her applications were denied initially and on reconsideration. Plaintiff then requested a hearing,

which initially took place before Administrative Law Judge Douglas White on May 3, 2005, and was continued to September 1, 2005, before Administrative Law Judge William Overton ("the ALJ"). Despite repeated reminders of her right to obtain an attorney, plaintiff appeared at the hearings - and has chosen to remain - unrepresented by legal counsel. [Tr. 56, 276, 292].[1]

On October 4, 2005, the ALJ issued a decision denying benefits, considering a closed period of alleged disability between December 18, 2002, and January 15, 2004. [Tr. 15]. He concluded that during the closed period plaintiff suffered from "back and neck pain," which are "severe" but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 18]. The ALJ ruled that plaintiff retained the residual functional capacity ("RFC") to perform the full range of light work. [Tr. 18]. Relying on vocational expert testimony, the ALJ determined that plaintiff remained able to perform her past relevant work. [Tr. 19]. Alternatively, again relying on vocational expert testimony, the ALJ determined that plaintiff remained able to perform a significant number of other light and sedentary jobs existing in the regional and national economies. [Tr. 19]. Plaintiff was accordingly deemed ineligible for benefits.

Plaintiff then sought, and was denied, review from the Commissioner's Appeals Council, despite the submission and consideration of additional medical records.

---

[1] On December 29, 2006 [doc. 14], United States Magistrate Judge Dennis H. Inman denied plaintiff's motion to appoint counsel, correctly noting that plaintiffs are not entitled to court-appointed counsel in civil actions.

[Tr. 4, 7, 268-73]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. Through her timely complaint, plaintiff has properly brought her case before this court. *See* 42 U.S.C. § 405(g).

II.

*Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if she (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any

3

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A).[2] Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

---

[2] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. 42 U.S.C. § 1382. "Disability," for SSI purposes, is defined the same as under § 423. 42 U.S.C. § 1382c(a)(3).

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof during the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id.*

III.

*Background*

Plaintiff has a college degree. [Tr. 78, 178]. She has continued to take a full-time college courseload since the alleged onset of her disability, and as of September 2005 she was enrolled in the graduate education program at East Tennessee State University, taking more than the minimum full-time load. [Tr. 178, 280, 294]. Her past relevant employment is as an office worker, telemarketer, and collections agent. [Tr. 73, 92-95, 295].

Plaintiff claims constant pain, fatigue, anxiety, and depression. [Tr. 103]. She purportedly can sit or stand for only short periods of time due to pain. [Tr. 278-79].

Plaintiff is able to care for her own personal needs and those of her two young daughters who live with her. [Tr. 109, 159]. She is able to vacuum, dust, mop, cook, wash dishes, and do laundry, although she at one point claimed that her young children or other relatives assist her and that "[i]t's very hard to do laundry." [Tr. 109]. These claims are dubious, as plaintiff stated in a subsequent interview only three weeks later that she cleans her home *after* her children leave for school. [Tr. 159].

Plaintiff is also able to drive and shop at least weekly. [Tr. 110]. She can run errands and take her children to the park and library. [Tr. 159].

5

Plaintiff's full-time college courses during the relevant period included a tap dancing class. [Tr. 305]. When asked at her second administrative hearing why she was able to attend college full-time while simultaneously unable to work, plaintiff answered,

> I knew, based on the severity of the pain that I had, I wouldn't be able to, they probably wouldn't let me stay at a job long enough to be able to sit that long. . . . the teachers worked with me when I was at, at school . . . Whereas if you go to a job, who's to say that they won't fire me because they, or be afraid that you're going to file a workman's comp or something like that[.]

[Tr. 305].

IV.

*Relevant Medical Evidence*

The treatment records of Dr. John McFadden (Tupelo Pain Clinic) commence on January 28, 2003. That date, Dr. McFadden noted plaintiff's complaints of head and neck pain secondary to a December 18, 2002 fall. [Tr. 137]. A December 26, 2002 CT scan of the head was "normal." [Tr. 140].

At the initial appointment, Dr. McFadden completed a fibromyalgia worksheet which purports to follow the "1990 criteria for the classification of fibromyalgia." [Tr. 138]. The form states that fibromyalgia may be indicated by the presence of pain in 11 of 18 designated tender points. [Tr. 138]. According to Dr. McFadden's notes, pain was present at only five of the tender points. [Tr. 137-38]. His January 28, 2003 appointment notes conclude with the recommendation that plaintiff should engage in "no lifting." [Tr. 137].

At a February 2003 followup appointment, plaintiff reported worsening head, neck, and back pain. [Tr. 136]. Plaintiff offered similar complaints at an appointment in March 2003. [Tr. 135]. That date, despite his recent finding of only five positive tender points, Dr. McFadden diagnosed fibromyalgia. [Tr. 135].

On April 3, 2003, Dr. McFadden opined that plaintiff would be able to stand less than two hours per workday. [Tr. 133]. He further stated that bending, pushing, pulling, and lifting aggravate plaintiff's pain, and that neck surgery was needed. [Tr. 133]. Dr. McFadden's office notes from two weeks later contain the statements "no work ... apply [for Social Security]." [Tr. 132].

In May 2003, Dr. McFadden completed another fibromyalgia worksheet, again purporting to follow the "1990 criteria for the classification of fibromyalgia." [Tr. 131]. The form again states that fibromyalgia may be indicated by the presence of pain in 11 of 18 designated tender points. [Tr. 131]. Dr. McFadden observed pain in only nine tender points. [Tr. 131]. Nonetheless, on June 10, 2003, Dr. McFadden wrote that plaintiff "now has fibromyalgia . . . . I will go ahead and obtain a lumbar MRI scan. . . . This patient remains temporarily totally disabled." [Tr. 129].

The lumbar MRI was performed in June 2003 and was "within normal limits." [Tr. 139]. This result was consistent with a lumbar MRI taken the previous month producing wholly "normal" results. [Tr. 145-47].

7

Dr. Eugene Stone performed a consultative physical examination in May 2003. Plaintiff reported back pain, headaches, and depression. [Tr. 148]. Dr. Stone's physical findings were largely "normal," although he noted "some tenderness over the spinous processes of the cervical spine." [Tr. 149]. Dr. Stone offered no diagnoses other than to record plaintiff's self-reports of herniation, anxiety, and depression. [Tr. 149].

Mary Roberts, Ph.D., performed a consultative mental evaluation in November 2003. Plaintiff denied any history of mental health treatment. [Tr. 157]. She reported that her pain medication "stops the pain." [Tr. 158]. Ms. Roberts's observations were unremarkable. [Tr. 158-59]. For example, she noted no signs of anxiety or depression and concluded that "[t]here do not appear to be significant limitations to daily functioning." [Tr. 158-59]. Similarly, Ms. Roberts predicted no vocational limitations. [Tr. 160].

Plaintiff was treated by Dr. Thomas Glasgow from prior to her alleged onset date through May 2004. Throughout, Dr. Glasgow's treatment notes generally indicate an absence of: pain [Tr. 180, 190, 197, 202, 209, 213]; spinal tenderness [Tr. 181, 191, 198, 203, 210, 214]; anxiety [Tr. 180-81, 190, 192, 197, 199, 202, 204, 209, 211, 213, 215]; and depression [Tr. 180-81, 189-90, 192, 196-97, 199, 201-02, 204, 208-09, 211-13, 215]. On December 23, 2002, plaintiff complained of headaches. [Tr. 209]. A contemporary CT scan was "normal." [Tr. 207].

Dr. Glasgow made June and July 2003 notations of "herniated cervical disc" and "herniated lumbar disc." [Tr. 199, 204]. These remarks would appear to be based on

plaintiff's self reports, as her May and June 2003 lumbar MRIs were "normal." [Tr. 139, 145-47].[3]

On October 8, 2004, plaintiff was treated at "Medical Care." The records of that visit indicate that plaintiff denied neck or back pain. [Tr. 241]. No spinal tenderness was observed. [Tr. 242]. Plaintiff reported fatigue, depression, and anxiety. [Tr. 241]. The records describe a "Stress reaction, acute, New." [Tr. 242]. More specifically, it was noted that plaintiff "recently moved from Miss[issippi] to be closer to husband who is in prison nearby for 3 years. Raising two little girls with no family in the area and going to school." [Tr. 242].

Similarly, the records of a March 2005 gastroenterologist appointment concerning constipation indicate that, "She has lost over 7 pounds in the past year for unexplained causes, however, she was admittedly under stress as a graduated [sic] student who is separated from her husband and raising two daughters." [Tr. 250]. Likewise, the February 2005 office notes of the same source reveal that plaintiff "admits to a high level of stress in her life. She is a graduate student at ETSU studying early childhood education. She is separated from her husband and is raising two daughters." [Tr. 252].

---

[3] At her second administrative hearing, plaintiff testified that "one of the doctors, he was telling me that I had, he did x-rays and said I had a herniated disc[.]" [Tr. 302]. This contention is not supported by any x-ray or physician statement in the administrative transcript of this case.

V.

*Vocational Evidence*

Dr. Robert Spangler ("Dr. Spangler" or "VE") testified as a vocational expert at the second administrative hearing in this case. The ALJ presented a hypothetical claimant of plaintiff's height, weight, education, and work experience who would be capable of light and sedentary work with no psychological restrictions. [Tr. 306].

Dr. Spangler responded that the hypothetical worker would be capable of performing plaintiff's past relevant work. [Tr. 306]. In the alternative, Dr. Spangler identified numerous jobs existing in the regional and national economies that the hypothetical claimant could perform. [Tr. 307-08]. If the hypothetical claimant was "unable to tolerate an eight-hour work day because of her back pain and because of the therapy she was undergoing," all employment would be precluded. [Tr. 308].

VI.

*Analysis*

Plaintiff offers several brief arguments in support of reversal or remand. The court will address these theories in turn.

A. Closed Period of Disability

Plaintiff "disagree[s] with the date of closure (January, 2004) made by the Administrative Judge." At her May 2005 administrative hearing, plaintiff admitted that she was presently able to work due to improvements resulting from physical therapy. [Tr. 279].

She testified that this improvement occurred sometime between 2003 and 2005. [Tr. 279-80].

The court has reviewed the transcripts of both administrative hearings and finds that the concept of a closed period of disability was clearly explained to plaintiff. Moreover, the following excerpt from the September 2005 hearing wholly forecloses plaintiff's argument.

> Q: Why do you feel that you're unable to work now?
>
> A: Oh, **I'm not saying that I am unable to work**. It's just when I did have the accident, for a while, I was not because I had a lot of severe back pain.
>
> Q: **Are you asking for a closed period of disability** –
>
> A: **Yes, sir**.
>
> . . .
>
> Q: Now when did you feel that you could go back to work?
>
> . . .
>
> A: It may have been 2003 because I was still going to doctor, different doctors.
>
> Q: So it is better now?
>
> A: Yes, sir. But it's, I mean, I can't, still based on doctor's advice, I can't move like up to a certain amount of pounds or do anything strenuous.
>
> . . .
>
> Q: So it's, your back, that's what this hearing's about?
>
> A: It has improved, yes, sir.
>
> . . .

Q: Now, when specifically do you feel that you were able to return to work . . . so I can narrow my –

A: Okay. In –

Q: – review to that period of time and not a continuing disability?

A: Okay. . . . After I had – because I went to the doctor for like a year and that was the entire year of 2003. And then I continued there after [sic]. In 2004, I went to therapy, so during that time –

Q: But you started school [at ETSU] in August [2004]?

A: Yes, sir.

Q: Was it sometime before that or was it –

A: **Yes, sir**. Because I moved here – I'm thinking like July, and I was still going to the [INAUDIBLE], **it was like January of 2004**. I started school in August 2004.

Q: So from December the 18th, 2002 to January –

A: Some –, **during like the beginning of the year**.

Q: January 30th?

A: Oh, I [INAUDIBLE] I don't know.

Q: Well I leave it up to you.

A: Okay. . . .

Q: Well, no, I don't want to, I don't want to talk you into anything, I mean, I –

A: Okay.

. . .

Q: So you started [therapy] back in January [2004] then?

A: Yes, sir. . . .

. . .

Q: **Why don't I just put it at January 15th, 2004**, the middle of the month.

A: That, **yes, sir, that's fine**.

. . .

Q: **But you're not asking for a continuing period of disabled [sic]?**

A: **No, sir.**

Q: **But you're asking for a closed period of disability?**

A: Based on, **yes, sir**.

[Tr. 296-301] (emphasis added).

In sum, plaintiff acknowledged that her alleged disability had ceased and that she was seeking only a closed period of benefits. She also expressly agreed with the end date chosen by the ALJ. This issue merits no further discussion.

B. Date Last Worked

In his decision, the ALJ stated that, "The claimant reported that she last worked in 2001 due to a back injury." [Tr. 16]. As worded, this statement is incorrect or at least imprecise. Plaintiff claimed to have been injured in December 2002, but she reported that she stopped working on February 2, 2001, because she was "discharged." [Tr. 72].

In light of this discrepancy, plaintiff "find[s] that the Administrative Law judge [sic] findings are not credible for reasons set forth in his decision regarding this case." The court disagrees and finds the error to be harmless, if not trivial. The ALJ consistently evaluated plaintiff's claim using the correct alleged onset date of December 2002. [Tr. 15-20]. Any discrepancy regarding *why* plaintiff stopped working in 2001 is irrelevant. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is a reason to believe that the remand might lead to a different result." *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

### C. Pain / Treating Physician Opinion

Next, plaintiff contends that she should have been found disabled due to back and neck pain. On a similar note, she argues that the records of treating physician McFadden were not properly considered.

Although Dr. McFadden vaguely opined that plaintiff could not work, substantial evidence supports the ALJ's rejection of that opinion as lacking in meaningful objective support. [Tr. 18]. The opinions of treating physicians are entitled to great weight when supported by sufficient clinical findings consistent with the evidence. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). However, the Commissioner may reject the opinion of a treating physician if it is not supported by sufficient medical data and if the ALJ articulates a valid basis for doing so. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.

1985); 20 C.F.R. § 404.1527(d)(3).

A December 2002 CT scan of the head was "normal." [Tr. 140]. May and June 2003 lumbar MRIs produced "normal" results. [Tr. 139, 145-47]. The records of Dr. Glasgow repeatedly document an absence of either pain or spinal tenderness. Although Dr. Stone observed "some" spinal tenderness, any limitation was reasonably taken into account when the ALJ restricted plaintiff to light and sedentary work.

Further, in November 2003, plaintiff told Ms. Roberts that her pain medication "stops the pain." [Tr. 158]. Dr. Glasgow's notes consistently reflect an absence of either anxiety or depression. During the relevant period, plaintiff was able to successfully maintain a full-time college courseload (*including a class in tap dancing*) and care for two young children. She can perform housework and run errands. These facts, paired with the lack of supporting objective evidence, would certainly lead a reasonable factfinder to conclude that plaintiff was also capable of performing light and sedentary jobs without limitation.

Lastly, the court notes Dr. McFadden's diagnoses of fibromyalgia, despite the fact that his own worksheets document an insufficient number of positive tender points. The present case stands in stark contrast to the Sixth Circuit Court of Appeals's recent decision in *Rogers v. Commissioner of Social Security*, ___ F.3d ___, 2007 WL 1501302 (6th Cir. May 24, 2007). The *Rogers* panel termed fibromyalgia an "accepted medical condition" and remanded the ALJ's denial of benefits. In *Rogers*, however, there existed consistent evidence of fibromyalgia from multiple sources using current "medically-accepted and

15

recognized" techniques. *Id.* at 7-9. Conversely, the present case contains only Dr. McFadden's opinions which are not even supported by his own diagnostic worksheets. The court notes this contrast with *Rogers* only as an aside, as plaintiff has not claimed to this court that she was at any time disabled by fibromyalgia.

### D. Dr. Glasgow

According to plaintiff, the records of Dr. Glasgow are erroneous. She contends that "I have never denied to Dr. Glasgow the level or severity of my pain, nor injuries. I admitted to him during the majority of my doctor appointments that I continued to be depressed [and] had anxiety issues[.]"

The ALJ relied in part on Dr. Glasgow's records as grounds for rejecting the opinions of Dr. McFadden. [Tr. 16-18]. As noted above, Dr. Glasgow's records consistently undermine plaintiff's claims of pain, tenderness, anxiety, and depression by noting an absence of complaints regarding all of those conditions.

The ALJ was clearly presented with a conflict between the records of a disinterested treating physician and the subjective complaints of an interested claimant. The substantial evidence standard of review grants ALJs a "zone of choice" within which they can evaluate conflicting evidence. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

> It is the ALJ's job to make precisely that kind of judgment. It is a difficult job, and the people who perform it sometimes err. Such errors are obviously difficult for a reviewing court to detect (the reviewing court not having seen the claimant in the flesh), and we will not normally substitute our impressions on the veracity of a witness for those of the trier of fact. ***We would be particularly reluctant to do so in this case, where there seem to be demonstrable discrepancies between what the claimant said on the stand and what the written record shows***.

*Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (emphasis added). The present ALJ was well within reason to rely upon the office notes of disinterested treating physician Glasgow. The court finds no error.

### E. "Vocational Factors"

Plaintiff next argues that "[m]y vocational factors should not be the prevailing determinant in this case[.]" "Vocational factors" are age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(g), 404.1560(c). At step five of his sequential analysis, the ALJ is required to consider a claimant's vocational factors. *See id.* The present ALJ did as he is required to do, considering also any additional limitations reasonably supported by the objective record. The court finds no error.

### F. Medication Side Effects

Plaintiff next cites "adverse side effects to Naproxen and the medicine that I was administered for bladder issues that I had from 2003-2005 as a direct result of my back pain." The court again notes that Ms. Roberts's November 2003 evaluation contains only a positive report of medication performance without mention of side effects. [Tr. 158].

Treatment records for complaints of constipation and urinary frequency do not indicate any associated vocational limitations. [Tr. 237-42, 250-55]. Those records also appear to consider as relevant the events then occurring in plaintiff's life. The October 2004 file of "Medical Care" describes a "Stress reaction, acute, New," noting that plaintiff "recently moved from Miss[issippi] to be closer to husband who is in prison nearby for 3 years. Raising two little girls with no family in the area and going to school." [Tr. 242]. Similarly, the records of a March 2005 gastroenterology appointment indicate that, "She has lost over 7 pounds in the past year for unexplained causes, however, she was admittedly under stress as a graduated [sic] student who is separated from her husband and raising two daughters." [Tr. 250]. Likewise, the February 2005 office notes of the same source reveal that plaintiff "admits to a high level of stress in her life. She is a graduate student at ETSU studying early childhood education. She is separated from her husband and is raising two daughters." [Tr. 252].

The court appreciates the difficulty of maintaining full-time course work while raising two young children with a spouse in prison. However, these factors, although undoubtedly challenging, are not grounds for an award of disability benefits.

### G. Additional Evidence

Plaintiff submitted to the Appeals Council six pages of additional medical records. [Tr. 268-73]. "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district

court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted). This court can, however, remand a case for further administrative proceedings, but only if the claimant shows that her evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). *Id.* The present plaintiff has made no effort to articulate how her evidence warrants sentence six remand, nor has she even cited sentence six. The issue is accordingly waived. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is appropriate.").

Alternatively, considering the issue of sentence six in light of plaintiff's *pro se* status, the additional evidence is of no benefit. Plaintiff first submits a bill for a 2003 chest x-ray. She does not, however, explain why she could not have provided this document to the ALJ, nor does she endeavor to cite the relevance of this billing statement. She has therefore failed to demonstrate either good cause or materiality.

Next, plaintiff submits three pages of undated discharge instructions pertaining to strep throat. Lastly, she offers a November 2004 and a February 2005 prescription for constipation and urinary medication. As with the bill for her 2003 chest x-ray, plaintiff does not explain why these papers could not have been timely provided to the ALJ, nor is their purported relevance made clear. Plaintiff has again therefore failed to show good cause or

materiality. None of her late-submitted evidence warrants sentence six remand.

### H. Conclusion

For the reasons provided herein, the Commissioner's final decision must be affirmed upon substantial evidence review. An order consistent with this opinion will be entered.

ENTER:

        s/ Leon Jordan
United States District Judge